UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #
DATE FILED: 12/30/10
```

WILLIAM CARDOZA,                                 :
                                                 :
                              Petitioner,         :     **REPORT AND**
                                                 :     **RECOMMENDATION**
                   - against -                    :
                                                 :     **08 Civ. 8210 (PAC) (RLE)**
DAVID ROCK, et al.,                              :
                                                 :
                              Respondents.         :

To the HONORABLE PAUL A. CROTTY, U.S.D.J.:

## I. INTRODUCTION

Petitioner William Cardoza is currently incarcerated at the Great Meadow Correctional Facility in Comstock, New York. On September 24, 2008, he filed the instant Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 2.) Cardoza was convicted of two counts of conspiracy to possess a controlled substance in the second degree (N.Y. PENAL LAW § 105.15); two counts of criminal possession of a controlled substance in the first degree (N.Y. PENAL LAW § 220.21(1)); and two counts of criminal possession of a controlled substance in the third degree (N.Y. PENAL LAW § 220.16(1)). He was sentenced to an aggregate indeterminate prison term of forty years to life. (Decl. in Opp'n to the Pet. for a Writ of Habeas Corpus ("Dannelly Decl."), Ex. E at 1; *see also* Pet'r's App'x at A1-3.)

Cardoza contends that his incarceration violates the United States Constitution because he was 1) denied the right to effective assistance of counsel and 2) denied the right to effective assistance of conflict-free counsel. For the following reasons, I recommend that Cardoza's Petition be **GRANTED, in part, and DENIED, in part,** and I recommend that Cardoza's case be remanded to New York State Court for a recalculation of his sentence in accordance with this Report and Recommendation.

## II. BACKGROUND

### A. The Crime

Between May and July 1997, the New York City Police Department's Drug Enforcement Task Force ("DETF") investigated Cardoza's role as a leader in the Juan Carlos Organization, a narcotics trafficking enterprise. (Tr. 101-06, 115.) The investigation used court-ordered wiretaps to intercept telephonic conversations between Cardoza and his associates to establish that Cardoza was responsible for negotiating large shipments of cocaine from Colombia to New York City, through Miami. (Mem. of Law in Opp. to the Pet. for a Writ of Habeas Corpus (Tr. 102, 330-37, 341-45.)

Cardoza's subsequent drug possession charges arose from two incidents. The first incident took place on June 6, 1997, when a DETF team seized 102 kilograms of cocaine at an automotive garage in Brooklyn. (Tr. 702-17.) As a result, the DETF officers arrested six men: Jose Sanchez, John-Fredi Parra, Arnoldo Parra, Victor Diaz, Carlos Carmona, and Jairo Losado. (Tr. 713, 718-21, 743, 845.) Sanchez, Carmona, and Diaz were prosecuted in the Eastern District of New York. (Tr. 857, 925.) Between June 7 and 9, Cardoza arranged for attorney Russell Carbone and his associates to represent five of the Brooklyn arrestees, with Carbone specifically representing Sanchez. (Tr. 940-41.)

On June 20, 1997, the Office of Special Narcotics Prosecutor for the City of New York ("OSN") intercepted a phone call between Cardoza and Mirklos Palacios. At the time of the call, Palacios was allegedly inside the same Brooklyn garage where the first drug seizure had taken place. (Tr. 946-54.) During the call, Cardoza instructed Palacios to see whether the government had seized all of the cocaine and to determine if DETF agents had dusted for fingerprints. (Tr. 960-61, 71.) The prosecution later used this intercepted phone call to link the cocaine recovered

2

from the Brooklyn garage to the Juan Carlos Organization. (Dannelly Decl., Ex. A at 4.)

Cardoza was arrested on July 3, 1997. The DETF team investigating the Juan Carlos

Organization seized a second shipment of cocaine that Cardoza had arranged to be imported into

New York City. (Tr. 1047-94.) The DETF agents recovered 135 kilograms of cocaine from an

automotive garage in Queens. Cardoza, Palacios, and four other men were arrested at the scene.

Consuela Perez, Cardoza's wife, was arrested later that day. (Tr. 1318-19.) Cardoza retained

Carbone to represent both him and Perez. (Pet'r's Mem. at 17.)

**B. Pretrial and Trial**

On July 2, 1997, prior to Cardoza's arrest, Victor Diaz, one of the Brooklyn arrestees,

took part in a sealed proceeding to determine appointment of new counsel. Siccardi, Diaz's

attorney of record, was not present for, nor was he told about, the sealed proceedings. (Pet'r's

App'x at A44, 51 (Government's Mot. for the Disqualification of Counsel ("Gov't Mot."), July

24, 1997).) During the closed proceedings, Diaz was asked by the court whether he wanted to be

represented by Siccardi or be assigned new counsel, but Diaz confirmed his desire to be

represented by Siccardi. (Gov't Mot. at A51.) Carbone and Cardoza spoke that evening about the

sealed proceedings and Cardoza complained that he had not been notified about the proceedings.

Carbone reassured Cardoza that efforts to obtain another lawyer had been "stopped." (Gov't

Mot. at A52.)

On or about July 24, 1997, after federal prosecutors learned of Carbone's interference

with co-defendant Diaz's proceeding, Assistant United States Attorney ("AUSA") Paul

Weinstein moved to disqualify Carbone from representing Jose Sanchez because of a purported

conflict of interest caused by Carbone's simultaneous representation of Cardoza, and allegations

that Carbone was a co-conspirator involved in the Juan Carlos Organization narcotics

3

conspiracy. (Gov't Mot. at A44-60.) Weinstein argued that Cardoza's hiring of Carbone and his associates to represent five of the individuals arrested in the first drug seizure, in addition to Cardoza's involvement in the Diaz proceeding, implicated Carbone as a co-conspirator in the case. He asserted that Cardoza and Carbone were interested in preventing a co-conspirator from cooperating with the Government because Carbone immediately contacted Cardoza following Diaz's sealed proceedings and assured him that Diaz had been prevented from cooperating with the Government, and potentially implicating Cardoza and others involved in the Organization. (Gov't Mot. at A53.)  Weinstein further argued that Carbone would be asked to testify about his discussion with Cardoza regarding Diaz's proceeding because Carbone had personal knowledge of facts at issue in the trial, thereby rendering Carbone an "unsworn witness." (Gov't Mot. at A55-58.)

On August 5, 1997, Carbone cross-moved to disqualify AUSA Weinstein and joined co-counsel Siccardi's motion to unseal the minutes from Diaz's closed court proceeding. (Pet'r's Mem. at 19.) On August 14, 1997, Siccardi was relieved as counsel for Diaz. (Pet'r's App'x at A36.) A few days later, Carbone withdrew his motion and removed himself from Sanchez's case.[1] (Pet'r's Mem. at 20 (citing Pet'r's App'x at A36).)

**1. Proffer Sessions: The Plea & Cooperation Agreement**

Pursuant to New York Criminal Procedure Law, there are four basic types of pleas a defendant can enter. As a matter of right, a defendant may select one of the two options and enter a plea of "not guilty" or a plea of "guilty to the entire indictment." N.Y. CRIM. PROC. LAW § 220.10(1). A third option allows a defendant, with the permission of the court and consent of

---

[1] Cardoza cites to the Criminal Docket, which does not explicitly state that Carbone withdrew from Sanchez's case, but Sanchez did appear in court represented by another attorney after October 20, 1997. (*See* P.'s App'x at A37.)

the people, to enter a plea of "guilty" to one or more of the offenses charged, or to a lesser included offense to any or all of the offenses charged, or to a combination of offenses charged and lesser offenses included. § 220.10(4)(a)-(c). The defendant may also plead "not responsible by reason of mental disease or defect," § 220.10(6).

Assistant District Attorney ("ADA") Lisa Tompkins was responsible for the wiretap investigation that led to Cardoza's arrest. The District Attorney's office decided not to make a plea offer to Cardoza. (Pet'r's App'x at A101; Aff. of Assistant District Attorney Lisa Tompkins ("Tompkins's Aff.") ¶ 4, Dec. 12, 2008.) "This decision was based upon his role as the leader of this multi-kilogram cocaine trafficking organization and the fact that he was charged with two separate A-1 felonies, as well as the strength of the case." (Tompkins's Aff. ¶ 4.) Tompkins informed Carbone that "the only way that the People would even consider making an offer to [Cardoza] was if he chose to cooperate. Hence, Carbone arranged for a proffer session with [Cardoza]." (*Id.* ¶ 7.)

On August 25, 1997, Cardoza engaged in the first of three proffer meetings with ADA Tompkins, Detective Nicastro, Detective Scanlon, and others. At the first proffer session, Carbone was presented with a "Standard Proffer Agreement" and, after privately meeting with Cardoza, signed the agreement. (*Id.* ¶ 8.) Cardoza claimed that he never saw or signed the proffer agreement. (Pet'r's App'x at A38; Aff. of William Cardoza ("Cardoza's Aff.") ¶ 11, Dec. 12, 2008.) The signed copy of the proffer agreement could not be located. (Tompkins's Aff. ¶ 8 n.2.)

After Tompkins reviewed the proffer agreement, Carbone left the proffer session and Cardoza was unaccompanied by counsel for the remainder of the session. (Pet'r's Mem. at 20-21.) Tompkins explained to Cardoza the minimum and maximum sentences he was facing and

5

informed him that the prosecutor's office would not make an offer to him to plead to a lesser charge because of the severity of his crimes and the role he played in the Organization. (Tompkins's Aff. ¶ 8.) Tompkins told Cardoza that the prosecutors would recommend a sentence of seventeen years to life contingent on Cardoza's full cooperation and that the only way that the sentencing recommendation could be reduced was through fruitful cooperation. (Tompkins's Aff. ¶ 8.) Cardoza admitted to heading the Juan Carlos Organization and importing multiple kilogram shipments of cocaine concealed in industrial machinery and transported in airplanes and freighters (Pet'r's App'x at A107.), and also to possession of both the 102 and 137 kilogram loads that were seized. (Tompkins's Aff. ¶ 8.) During the proffer session, Cardoza agreed to cooperate with the prosecution in an effort to reduce the sentence of his wife, Consuela Perez, and assure her release on bail. (Pet'r's Mem. at 21.) Cardoza stated that between the first and second proffer sessions, Carbone told him that the prosecutor's evidence in the case was "weak." (Cardoza's Aff. ¶ 13.) During that time, Carbone offered to pay off the prosecutor and the judge for $500,000, but Cardoza refused. (Cardoza's Aff. ¶ 13.)

Carbone was not present at the second proffer session. (Cardoza's Aff. ¶ 14.) The prosecutor and detectives asked for information pertaining to other drug dealers, but Cardoza refused to give any information beyond his own role in the Juan Carlos Organization. (Cardoza's Aff. ¶ 14.)

In court on September 10, 1997, Tompkins presented the defendants with a plea letter listing the plea offers to each defendant and descriptions of their individual roles in the narcotics conspiracy. (Pet'r's Mem. at 22.) For Cardoza, the offer was seventeen years to life if Cardoza chose to plead to the top count of the indictment before trial. (Tompkins's Aff. ¶ 5.) Carbone

6

told the judge that the parties were "engaged in plea negotiations with Tompkins." (Pet'r's Mem. at 22.)

After reaching what she believed to be a preliminary agreement with Carbone and Cardoza, and prior to the final proffer session, Tompkins prepared the "Plea Cooperation Agreement." (Tompkins's Aff. ¶ 9.) This agreement contained the terms of cooperation and sentencing options depending on the extent and outcome of Cardoza's cooperation. (Pet'r's App'x at A108-15.) According to the plea agreement, if Cardoza's cooperation proved fruitless but not in violation of the terms of the Plea Agreement, then the OSN would consent to a guilty plea to a class A-1 felony of criminal possession of a controlled substance in the first degree, and a negotiated sentence of "an indeterminate term of 17 years." (*Id.* at A109.) If however, OSN determined that Cardoza's cooperation was successful and justified a sentence of less than seventeen years, then OSN would recommend a reduced sentence. (*Id.*) Finally, if OSN determined that Cardoza violated any of the terms of the agreement, Cardoza's guilty plea to first-degree possession would be entered and he would receive "the maximum sentence permitted under the law, an indeterminate term of imprisonment of 25 to life, unless OSN, in its sole discretion, consent[ed] to a lesser sentence." (*Id.* at A110.)

At the third and final proffer session on September 11, 1997, Carbone was present and reviewed the agreement with Cardoza. (Tompkins's Aff. ¶ 9.) Cardoza alleges that:

> Carbone urged me to sign the document, which he described as "ministerial." [He] said that if I signed the document I would go home. He did not explain the purpose of the document, describe its contents, or give me time to read it. Someone other than Mr. Carbone—a detective or prosecutor—told me that it was a cooperation agreement. This person quickly explained that if I gave up people and if drugs were confiscated I would get one sentence. He also said that if the information was not accurate I would get a higher sentence that I could not appeal. No one told me what sentence I could get if I agreed to plead guilty but did not cooperate against others.

7

(Cardoza's Aff. ¶ 16.)

Cardoza refused to sign the agreement (Cardoza's Aff. ¶ 18.) and plea negotiations collapsed. (Pet'r's Mem. at 25). Carbone did not explore or advise Cardoza of any other plea options pursuant to C.P.L. § 220.10(2). (Pet'r's Mem. at 24; Cardoza's Aff. ¶ 20.) Moreover, Carbone did not ask the prosecutors if they were willing to offer Cardoza a plea that did not involve cooperation, (Pet'r's App'x. at A98; Affidavit of Russell J. Carbone ("Carbone's Aff.") ¶ 9, Dec. 12, 2008.) nor did he approach the trial judge to see if she would be willing to offer Cardoza a reduced sentence in exchange for his plea to the entire indictment. (Pet'r's Mem. at 25.) Cardoza dismissed Carbone as his attorney.

On September 23, 1997, Lawrence M. Herrmann filed a notice of appearance on behalf of Cardoza. (Pet'r's App'x at A121; Affidavit of Lawrence M. Herrmann ("Herrmann's Aff.") ¶ 4, Dec. 12, 2008.) He was replaced by Christopher Chan on or about April 3, 1998. (Herrmann's Aff. ¶ 12.). On June 16, 1998, ADA Joseph DePadilla took over prosecution of the case. (Pet'r's App'x at A123; Affidavit of Joseph DePadilla ("DePadilla's Aff.") ¶ 3, Dec. 12, 2008.) On or about September 9, 1998, the day before trial, Cardoza fired Chan and retained Irving Anolik to represent him. (DePadilla's Aff. ¶ 3.) Anolik represented Cardoza throughout his trial. None of the attorneys that came after Carbone discussed the option of pleading to the entire indictment with Cardoza. (Pet'r's Mem. at 28, 63-64; Pet'r's App'x at A125.)

Following a jury trial in Supreme Court, New York County, on March 31, 1999, Cardoza was convicted of two counts of conspiracy in the second degree (N.Y. PENAL LAW § 105.15), two counts of criminal possession of a controlled substance in the first degree (N.Y. PENAL LAW § 220.21(1)), and two counts of criminal possession of a controlled substance in the third degree

(N.Y. PENAL LAW § 220.16(1)). He was sentenced to an aggregate indeterminate prison term of forty years to life. (Dannelly Decl., Ex. E at 1; *see also* Pet'r's App'x at A1-3.)

## C. Post-Trial Procedural History

On direct appeal, Cardoza argued ineffective assistance of counsel by pretrial counsel, Russell Carbone. (Dannelly Decl., Ex. A.) On October 27, 2005, the Appellate Division unanimously affirmed Cardoza's conviction. *People v. Cardoza*, 803 N.Y.S.2d 65 (N.Y. App. Div. 2005); (Dannelly Decl., Ex. E; *see also* Pet'r's App'x at A1-3.) On November 21, 2005, Carbone filed an application for permission to appeal the Appellate Division's decision to the Court of Appeals. (Dannelly Decl., Ex. F.) On February 23, 2006, the New York Court of Appeals summarily denied leave to appeal. *People v. Cardoza*, 845 N.E.2d 1281 (N.Y. 2006); (Dannelly Decl., Ex. J.)

### 1. Collateral Motions

On September 20, 2006, acting *pro se*, Cardoza filed a motion to vacate judgment pursuant to C.P.L.§ 440.10. (Dannelly Decl., Ex. K.) On December 26, 2006, he submitted a *pro se* addendum to his original § 440.10 motion (Dannelly Decl., Ex. L), and on July, 10, 2007, Cardoza's counsel, Svetlana Kornfeind, filed a supplement (Dannelly Decl., Ex. N). On October 4, 2007, the court denied Cardoza's motion to vacate judgment. (Dannelly Decl., Ex. Q.) On November 15, 2007, Cardoza filed an application for leave to appeal the court's denial of his § 440.10 motion (Dannelly Decl., Ex. R), which the Appellate Division, First Department, denied on February 21, 2008. (Dannelly Decl., Ex. T.)

### 2. Resentencing

On June 9, 2006, Cardoza asked the state court's permission to be resentenced on his two Class A-1 convictions, a forty-year to life sentence, pursuant to the New York Drug Law Reform

9

Act of 2004. (Pet'r's App'x at A16-18; Pet'r's Mem. at 33-34.) On September 22, 2006, Cardoza

was resentenced on his two A-1 felony convictions, the judge removing the life term for each A-

1 felony and replacing it with two consecutive fifteen-year determinate prison terms to be

followed with five years of post-release supervision. Cardoza's indeterminate sentence for his

other convictions was left undisturbed. (Pet'r's App'x at A16-18.) Thus, Cardoza is serving a

thirty year determinate sentence for his class A-1 felony convictions, and an eight to twenty-five

year consecutive determinate sentence for his Class B felony convictions.( *Id.)* His full sentence

is now thirty to fifty years.

### III. DISCUSSION

**A. Threshold Issues**

    **1. Timeliness**

      A petitioner must file an application for a writ of habeas corpus within one year of his

conviction becoming final. *See* 28 U.S.C. § 2244(d)(1). A conviction becomes final "when [the]

time to seek direct review in the United States Supreme Court by writ of certiorari expire[s],"

*Williams v. Artuz*, 237 F.3d 147, 150 (2d Cir. 2001) (quoting *Ross v. Artuz*, 150 F.3d 97, 98 (2d

Cir. 1998)), that is, ninety days after the final determination by the state court. Pursuant to the

Antiterrorism and Effective Death Penalty Act ("AEDPA"), the one-year limitation period is

statutorily tolled while state court relief is pending. 28 U.S.C. § 2244(d)(2); *Smith v. McGinnis*,

208 F.3d 13, 16-17 (2d Cir. 2000) (*per curiam*), *cert. denied*, 531 U.S. 840 (2000). The statute of

limitations may be tolled by post-conviction motions. Time is tolled by appeal of conviction and

collateral motions until leave to appeal any ruling is denied. *See Rodrigues v. Portuondo*, 2003

WL 22966293, at *1-2 (S.D.N.Y. Dec. 15, 2003); *see also Carey v. Saffold*, 536 U.S. 214, 216

(2002); *Bennett v. Artuz*, 199 F.3d 116, 119 (2d Cir. 1999), *aff'd*, 531 U.S. 4 (2000).

Cardoza was denied leave to appeal by the Court of Appeals on February 23, 2006. On September 28, 2006, he filed his collateral motion to vacate judgment pursuant to C.P.L. § 440.10. Approximately seven months had elapsed. Cardoza had pending applications in state court continuously until two months after he filed the instant Petition. Because of the tolling provision in AEDPA, his initial Petition on September 24, 2008, was timely.

### 2. Exhaustion

Pursuant to 28 U.S.C. § 2254(b), as amended by AEDPA, the Court may not consider a petition for habeas corpus unless the petitioner has exhausted all state judicial remedies.  28 U.S.C. § 2254(b)(1)(A); *Picard v. Connor*, 404 U.S. 270, 275 (1971); *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997).  In order to satisfy substantive exhaustion, a petitioner's claim before the state courts must have been federal or constitutional in nature.  Although not an exacting standard, a petitioner must inform the state courts of "both the factual and the legal premises of the claim [he] asserts in federal court." *Rodriguez v. Vacco*, 126 F.3d 408, 413 (2d Cir. 1997) (*quoting Daye v. Attorney Gen.*, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*)). He may meet this requirement by:

> a) reliance on pertinent federal cases employing constitutional analysis, b) reliance on state cases employing constitutional analysis in like fact situations, c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and   d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Daye*, 696 F.2d at 194.

Procedurally, the petitioner must utilize all avenues of appellate review within the state court system before proceeding to federal court. *See Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994). The petitioner must raise a federal claim at each level of the state court system,

"present[ing] the substance of his federal claims 'to the highest court of the pertinent state.'" *Id.* (quoting *Pesina v. Johnson*, 913 F.2d 53, 54 (2d Cir. 1990)).

Cardoza initially presented his first claim of ineffective assistance of counsel in his C.P.L.§ 440.10 motion to vacate judgment, where the federal nature of Cardoza's claim was sufficient "to call to mind a specific right protected by the Constitution." (*See* Dannelly Decl., Ex. N at 1.) Cardoza's motion was denied by the New York Supreme Court, the court holding that he had not been denied effective assistance of counsel. (Dannelly Decl., Ex.Q at 7.) Then, in his leave application to the Appellate Division, Cardoza raised the same constitutional claim and relied on federal case law in support of his motion. (*See* Dannelly Decl., Ex. R.) The Appellate Division denied Cardoza leave to appeal. Therefore, Cardoza's first claim of ineffective assistance of counsel has been both substantively and procedurally exhausted.

Cardoza presented his second claim of ineffective assistance of counsel based on conflict of interest on direct appeal, and his claim sufficiently asserted "a specific right protected by the Constitution." (*See* Dannelly Decl., Ex. A at 28-30.) The Appellate Division unanimously denied Cardoza's motion and unanimously affirmed the judgment of conviction. (Dannelly Decl., Ex. E.) Cardoza then sought leave to appeal to the Court of Appeals, raising the same claim and a violation of rights protected by the Constitution. (Dannelly Decl., Exs. F, G.) The Court of Appeals denied Cardoza's leave to appeal. (Dannelly Decl., Ex. J) Cardoza's second claim of ineffective assistance of counsel based on conflict of interest has been substantively and procedurally exhausted.

### B. Merits of the Claims

#### 1. Standard of Review

AEDPA limits issuance of the writ to circumstances in which the state adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254 (d)(1); *see Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is contrary to federal law if the state court applies "a conclusion opposite to that reached by [the Supreme] Court on a question of law or if [it] decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. Furthermore, in cases where the state court decision rests on a factual determination, the federal court must find that the "decision . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

#### 2. Claim One: Ineffective Assistance of Counsel, Failure to Convey Plea Option

The Sixth Amendment provides for the right to effective assistance of counsel. U.S. CONST. amend. VI; *see Strickland v. Washington*, 466 U.S. 668, 686 (1984). In order to prevail on a claim for ineffective assistance of counsel, Cardoza must first show 1) "that counsel's representation fell below an objective standard of reasonableness" measured under "prevailing professional norms" and 2) "that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different," therefore prejudicing him. *Id.* at 688, 694.

In reviewing ineffective assistance of counsel claims, a court must be deferential to an attorney's professional judgment and conduct and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

13

Therefore, "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id*. at 690.

The Supreme Court has expressly extended the application of the two-pronged *Strickland* test to ineffective assistance of counsel in the context of the plea negotiations. *Shiwlochan v. Portuondo*, 345 F. Supp. 2d 242, 259 (E.D.N.Y. 2004) (citing *Hill v. Lockhart*, 474 U.S. 52, 57 (1985)). The ultimate decision as to whether to accept a plea and what plea to enter is a decision reserved for the accused. ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION & DEFENSE FUNCTION R. 4-5.2 (3d ed. 1993) (hereinafter "ABA STANDARDS"); *Jones v. Barnes*, 463 U.S. 745, 751 (1983) (citing *Wainwright v. Sykes*, 433 U.S. 72, 93 n.1 (1977) (Burger, C.J., concurring)). Defense counsel, however, has the responsibility to inform the accused of developments in the case, including communicating and explaining all the plea proposals made by the prosecutor, to the extent reasonably necessary to permit the client to make informed decisions. ABA STANDARDS RR. 4-3.8(b); 4-6.6(b); MODEL RULES OF PROF'L CONDUCT RR. 1.4(a)(3); 1.4(b) (2009); *Boria v. Keane*, 99 F.3d 492, 946-47 (2d Cir. 1996) (*citing* ANTHONY G. AMSTERDAM, TRIAL MANUAL 5 FOR THE DEFENSE OF CRIMINAL CASES § 201 at 339 (1988)); *see Von Moltke v. Gillies*, 332 U.S. 708, 721 (1948). Defense counsel also has the responsibility to advise the accused with complete candor concerning all aspects of the case, including a candid estimate of the probable outcome. ABA STANDARDS R. 4-5.1. Therefore, where counsel has failed to render necessary advice and professional judgment, a defendant cannot be expected to make an informed decision that is in his best interest, MODEL RULES OF PROF'L CONDUCT RR. 1.4(a)(3); 1.4(b); 2.1, and the attorney's conduct has fallen below an objective standard of reasonableness. *Von Moltke*, 332 U.S. at 721; *Pham*, 317 F.3d at183 (citing *Cullen*, 194 F.3d at 404); *Purdy*, 208 F.3d at 44-45; *Boria*, 99 F.3d at 947-48.

14

An attorney's constitutional duty to inform his client about all plea options extends to a duty to counsel his client about a § 220.10(2) plea option. *See Shiwlochan*, 345 F. Supp. 2d at 261 ("[A]n attorney is obligated to convey to his client any plea offer, . . . [in order] to enable the client to make a reasoned decision as to what plea to enter."). This Court finds that it does not matter what type of plea was extended or who extended the plea in order for the constitutionally protected right to be informed and advised about a plea to attach. As a result, a defendant also has a right to be informed of the right to plead "guilty to the entire indictment." N.Y. Crim. Proc. Law § 220.10(2); *see Boria*, 99 F.3d at 497-98; *see also Shiwlochan*, 345 F. Supp. 2d at 261-62. Here, Cardoza's attorneys all independently failed to inform him about the multiple plea options that were available to him. Specifically, they failed to inform him of, and advise him about, the § 220.10(2) plea option.

First, Carbone brokered a full-cooperation plea that Cardoza was unwilling to take. (Pet'r's Mem. at 50.) Cardoza testified that he was unwilling to cooperate with the Government and enter into a full-cooperation plea because he feared retaliation against his family. (Pet'r's Mem. at 58; Cardoza's Aff. ¶ 18.) Carbone did not explore Cardoza's § 220.10(2) plea option to plead to the entire indictment and receive a sentencing recommendation of twenty to twenty-five years, exactly *half* of the sentence Cardoza received.[2] (Reply Affirmation of Svetlana Kornfeind ("Kornfeind's Reply Aff.") ¶ 12, Sept. 21, 2007.) Although Herrmann discussed "alternatives" with Cardoza, he also failed to convey the § 220.10(2) plea option. (*Id.* ¶ 9.) Herrmann indicated

---

[2]The prosecution offered to make a sentencing recommendation to the judge of twenty to twenty-five years if Cardoza pled guilty to the entire indictment pursuant to C.P.L. § 220.10(2). (Pet'r's App'x at A125.)

to Cardoza's current counsel that it was not in his practice to explore a § 220.10(2) plea option in state cases. (*Id.*)

When Chan replaced Herrmann as Cardoza's attorney, ADA DePadilla contacted Chan to review the earlier offer to plead guilty to the top count of the indictment with a sentencing recommendation of seventeen years to life. DePadilla informed Chan that the offer would remain open until July 31, 1998. (DePadilla's Aff. ¶ 4.) When the offer was withdrawn, DePadilla sent a memorandum to Chan indicating that the only remaining plea option left for Cardoza was to "plea on the day of trial [and] the People will insist [Cardoza] plea to the entire indictment [§ 220.10(2) plea option] and the People's recommendation for sentence will be an appropriate number between 20 and 25 years to life." (Pet'r's App'x at A125.) Cardoza once again refused to enter into the proffered agreement and Chan did not discuss the remaining § 220.10(2) plea option with Cardoza. (Kornfeind's Reply Aff. ¶ 10.)

Cardoza's final trial attorney, Anolik, failed to advise Cardoza of the § 220.10(2) plea option. (Pet'r's Mem. at 28.) Anolik stated that he did not recall discussing the § 220.10(2) plea option with Cardoza. (Kornfeind's Reply Aff. ¶ 11.) Despite Anolik's recollection, the trial judge, in considering Cardoza's post-conviction motion to vacate concluded, "Mr. Anolik, although hired for trial, spent four months presumably trying to reason with defendant before finally preparing and trying the case." (Dannelly Decl., Ex. Q.) The trial court's reasoning presumes that Anolik engaged in discussions with Cardoza about the § 220.10(2) plea option, contrary to Anolik's testimony that he did not recall doing so. (Pet'r's Mem. at 51-52; Kornfeind's Reply Aff. ¶ 11.)

Cardoza brought ineffective assistance of counsel and conflict of interest claims in his § 440.10 motion. Judge Wittner, the trial judge, denied Cardoza's motion, finding that

16

"defendant failed to sustain his burden of proof to show both that a plea offer was made and that none of his attorneys informed him of that offer." (Pet'r's App'x at A28; State Court's Decision Denying Petitioner's Motion to Vacate (J. Wittner), October 4, 2007, at 7.) Judge Wittner based this finding on the evidence that Cardoza's attorneys had discussed the plea and cooperation agreement proffered by the government with him, stating "[c]ounsel argues that [Cardoza] was denied effective assistance of counsel because none of the four attorneys he retained told him the People had offered him a plea of seventeen years to life nor explained the advantages of such a plea as opposed to going to trial. Had they done so, defendant claims he would have plead guilty." *(Id.)* This conclusion mistakes the plea and cooperation offer that Cardoza's attorneys did discuss with him for the § 220.10(2) plea option which Cardoza's attorneys did not discuss with him. The plea and cooperation agreement required Cardoza to cooperate with the Government. The § 220.10(2) plea option did not, and therefore did not have the risks associated with the Plea Agreement that Cardoza wanted to avoid. It is not disputed that Carbone and his successors conveyed the Plea and Cooperation Agreement offered by the Prosecution. Rather, Cardoza argues that Carbone, Herrmann, Chan, and Anolik all failed to discuss the § 220.10(2) plea option with him.

By failing to draw a distinction between these two separate and distinct plea options, the trial court refused to analyze whether Cardoza's attorneys' failure to convey the § 220.10(2) option was ineffective assistance of counsel. The fact that Cardoza refused to accept the plea and cooperation offer does not negate the other § 220.10(2) plea option that was available to him. Carbone, Herrmann, Chan, and Anolik all had the duty to convey and explore the § 220.10(2) plea option with Cardoza, especially considering the fact that Cardoza was facing an extensive sentence if he chose to go to trial. The failure of his attorneys to discuss the § 220.10(2) plea

17

option was conduct that fell below an "objective standard of reasonableness." *Strickland,* 466 U.S. at 687-88.

To prevail in his claim of ineffective assistance of counsel, Cardoza must also establish that there is "reasonable probability" that but for counsel's unprofessional errors the result of the proceeding would have been different, therefore prejudicing him. *Strickland,* 466 U.S. at 688-90. Sufficient objective evidence of prejudice can be shown when 1) a petitioner lacks accurate information to decide if he should enter a plea or go to trial, 2) the petitioner has stated he would have pled if he had access to accurate information, and 3) there is a significant disparity between the actual maximum sentencing exposure and the sentencing exposure represented by petitioner's attorney. *See United States v. Gordon,* 156 F.3d 376, 380 (2d Cir. 1998). In addition to informing a defendant of the alternative sentence exposures he will most likely face, an attorney has the duty to inform him of the strengths and weaknesses of the case. *Purdy,* 208 F.3d at 45 (citing *Gordon,* 156 F.3d at 380).

Cardoza was prejudiced because he did not have complete and accurate information upon which to make an informed decision whether to go to trial or plead. Neither Carbone nor his successors adequately informed Cardoza of the sentencing exposure he faced if convicted at trial. The record shows that Cardoza was not informed of the difference between trial with a possible maximum sentence of forty years to life and entering a § 220.10(2) plea to the entire indictment with a possible sentencing recommendation of twenty to twenty-five years. Cardoza has stated that he would have pled guilty if he had been informed of the § 220.10(2) plea offer. (Pet'r's App'x at A28; State Court's Decision Denying Petitioner's Motion to Vacate (J. Wittner), October 4, 2007, at 7.) The Court finds that but for the failure of Cardoza's attorneys to inform him of the risks associated with going to trial, there is "reasonable probability" that the

result of the proceeding would have been different. Accordingly, "objective evidence" for a different outcome is supported by the fact that there is a great disparity between the sentencing after trial and an undiscussed plea option. Therefore, Cardoza was prejudiced. Because DePadilla asserted that if Cardoza were to plead to the entire indictment, the prosecution's recommendation would be in the range of "20 to 25 years to life," and Cardoza indicates that he would have accepted such a deal, this Court can assume that Cardoza's sentence would not have been more than twenty-five years to life, but for his attorneys' deficiencies. *See Aied v. Bennett*, 296 F.3d 58, 63-64 (2d Cir. 2002).

### 3. Claim Two: Ineffective Assistance of Counsel, Conflict of Interest

The Sixth Amendment provides criminal defendants with the right to effective assistance of counsel "unhindered by a conflict of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981); *Cuyler v. Sullivan*, 446 U.S. 335, 355(1980) (citing *Holloway v. Arkansas*, 435 U.S. 475, 483 n.5 (1978)). Courts have recognized two types of conflict of interest claims: *actual* conflicts of interest, and conflicts of interest that constitute a *per se* violation of the Sixth Amendment.

#### a. *Per Se* Violation

The Second Circuit has held that a particularly egregious conflict of interest may constitute a *per se* violation of the Sixth Amendment. *United States v. Aiello*, 900 F.2d 528, 530-31 (2d Cir. 1990) (citing *Cuyler*, 446 U.S. at 349); *United States v. Williams*, 372 F.3d 96, 102 (2004). Courts have applied the *per se* rule in very limited circumstances, such as where an attorney is implicated in the same or closely related crimes of his or her client, and therefore the attorney has reason to fear that vigorous advocacy on behalf of his client would expose him to criminal liability. *Fulton*, 5 F.3d at 611 (2d Cir. 1993); *United States v. Cancilla*, 725 F.2d 867, 870 (2d Cir. 1984) (defense counsel was engaged in similar criminal schemes as defendant with

19

co-conspirator of defendant); *see also Solina v. United States*, 709 F.2d 160, 164 (2d Cir. 1983) (defense attorney was unlicensed and therefore operating in fear of what might happen if the court or prosecutor inquired into his background); *compare Aiello*, 372 F.3d at 531-32 (*per se* standard not met where attorney was under investigation for crimes unrelated to defendant's). A *per se* violation is unwaivable and does not require a defendant to demonstrate that he was prejudiced, or that his representation suffered in any way. *Williams*, 372 F.3d at 102; *Aiello*, 900 F.2d at 530-31 (citing *Cuyler*, 446 U.S. at 349).  The courts are reluctant to find a *per se* violation, and such a determination should be reserved for the most egregious circumstances. *Aiello*, 900 F.2d at 532; *see also United States v. Carbonaro*, 186 Fed. Appx. 41, 43 (2006); *United States v. Rondon*, 204 F.3d 376, 379-80 (2d Cir 2000);  *Waterhouse v. Rodriguez*, 848 F.2d 375, 382-83 (2d Cir.1988).

### b. Actual Conflict of Interest

An actual conflict of interest exists where "the attorney's and defendant's interest diverge with respect to a material factual or legal issue or to a course of action." *United States v. Schwarz*, 283 F.3d 76, 91 (2d Cir. 2002) (citing *Winkler v. Keane*, 7 F.3d 304, 307 (2d Cir. 1993)). Once a defendant "shows that a conflict of interest actually affected the adequacy of his representation [he] need not demonstrate prejudice in order to obtain relief." *Cancilla*, 725 F.2d at 870 (citing *Cuyler*, 446 U.S. at 349-50). In contrast to cases of *per se* violations, however, the conflict in actual conflict cases must adversely affect the attorney's performance. *Williams*, 372 F.3d at 102 (citing *United States v. Levy*, 25 F.3d 146, 152 (2d Cir. 1994)). "To prove that an actual conflict adversely affected counsel's performance, a defendant must show that a 'lapse in representation resulted from the conflict.'" *Williams*, 372 F.3d at 106 (citing *United States v. Malpiedi*, 62 F.3d 465, 469 (2d Cir. 1995)); *see also Schwarz*, 283 F.3d at 92. A defendant can

20

prove a lapse in representation by showing "that some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *Williams*, 372 F.3d at 106 (citing *Levy*, 25 F.3d at 157).

Courts have found an actual conflict of interest exists when an attorney engages in "wrongful conduct related to the charge for which the client is on trial," by participating in the criminal activity or criminal enterprise in which the client is accused of participating, *Fulton*, 5 F.3d at 609, and have extended this principle to situations where the defense attorney has been *accused* of a crime that is similar or related to those of his client. *Id.* at 609-10; *Mannhalt v. Reed*, 847 F.2d 576, 581 (9th Cir. 1989). In such cases, the allegations made against a defendant's attorney create two actual conflicts of interest: (1) if the allegations are true, then the attorney's representation is going to be burdened by the attorney's own interest in self-preservation and the attorney will likely be unable to provide the defendant with unbiased advice; (2) if the allegations are false, the defense is "impaired" because the attorney is prohibited from cross-examining the witness making the allegations because the attorney "cannot act both as advocate for his client and a witness on his client's behalf." *Fulton*, 5 F.3d at 610. Generally, an attorney can impeach a witness in cross-examination but an attorney who questions a witness making accusations against him effectively becomes an "unsworn witness." *Id.* It is sufficient that an attorney is accused of being involved in wrongdoing for an actual conflict of interest to exist because "the potential for diminished effectiveness in representation is so great." *Id.*

21

### c. Cardoza's Conflict Claims

### (1) *Per Se* Violation

Cardoza fails to establish that there was a *per se* violation. The instances that Cardoza

relies on to establish that Carbone was involved in the Organization's operation are purely

speculative and, even if true, would not be enough to support a finding of a *per se* conflict of

interest according to the standard set by *Solina* and *Cancilla*. Cardoza avers that Cabone was

"actively involved" in the same crimes that he was being charged with because: (1) "Carbone's

'legal' duties consisted of protecting the Organization by preventing [Cardoza's] associates from

cooperating with the prosecution," specifically, Carbone interfered with Victor Diaz's attempt to

cooperate with the Government (Pet'r's Mem. at 76-77), and (2) the wiretap evidence collected

by the Government corroborates the fact that Cardoza sent Carbone to the Brooklyn garage,

where the first drug bust occurred, to check to see if there was cocaine remaining and whether

the police had dusted for fingerprints. (Pet'r's Mem. at 77). Cardoza states that Carbone's

assistance at the garage established him as an "unindicted co-conspirator." (*Id.*) Cardoza asserts

that, "Carbone's thwarting of the [G]overnment's attempt to persuade [] Diaz from cooperating

advanced the criminal objectives of the Organization." (Pet'r's Mem. at 84.) Absent evidence

that Carbone has been indicted for conspiracy relating to any of the crimes associated with

Cardoza or the Organization, however, these claims do not suggest that Carbone's representation

of Cardoza was tainted by a fear of prosecution in the way that counsel were in *Solina* and

*Cancilla*.

Cardoza relies on *Fulton* to support the proposition that a mere allegation that counsel

was involved in his client's criminal activity can be enough to constitute a *per se* violation. In

*Fulton*, a government witness alleged *direct* knowledge that the attorney representing the

defendant was involved in the defendant's criminal acts. 5 F.3d at 607. At trial, in an *ex parte* conference with the judge, the government informed the judge that their witness alleged that the defense attorney had engaged in trafficking heroin into the United States on multiple occasions and that the government was commencing an investigation into the attorney's conduct. *Id.* Also relevant was the fact that the witness in *Fulton* was cooperating with the government in exchange for a reduced sentence and therefore, he had the incentive to be truthful because his plea agreement would have been jeopardized if he made false statements. The court held that Fulton's attorney could not represent him to the best of his abilities because he was preoccupied protecting his self-interest. *Id.* at 613. "Where there is a reasonable possibility that a witness's allegations are true, the district court, and this court, must assume the worst." *Id.* at 611.

The court in *Fulton* sought to limit application of the *per se* rule to the specific facts of that case. "[W]hen a government witness alleges that he has direct knowledge of criminal conduct by defense counsel, for purposes of constitutional analysis, we must treat such allegations as though they are credible." *Fulton*, 5 F.3d at 612. Those facts took the claim of conflict out of the realm of speculation. In contrast, the allegations against Carbone were not based on personal knowledge and could not provide the level of credibility needed to invoke the *per se* rule. *See Aiello*, 900 F.2d at 532. Furthermore, the alleged conflict in this case occurred in a pretrial context, and did not implicate the attorney's ability to effectively use cross-examination at trial. Finally, Cardoza, who was in the best position to produce strong evidence in support of the theory that Carbone was hired by Cardoza to facilitate and protect the criminal conduct of the Organization, failed to do so. The theoretical conflict raised, therefore, does not support application of the *per se* rule.

### (2) Actual Conflict

Cardoza also claims that his right to effective counsel was violated because of two *actual*
conflicts: (1) "Carbone's actual involvement in the business of the Organization adversely
affected his handling of [Cardoza's] plea decision," and (2) Carbone's simultaneous
representation of Cardoza and two co-defendants—Cardoza's wife, Consuelo Perez, and one of
the Brooklyn arrestees, Jose Sanchez. (Pet'r's Mem. at 72.) Specifically, Cardoza asserts that
Carbone's efforts to arrange proffer sessions between Cardoza and the prosecution furthered the
interests of Carbone's other client, Perez, because Cardoza admitted to his involvement in the
drug conspiracy and told the prosecution details of his work importing cocaine in exchange for
Perez's release on bail. (Pet'r's Mem. at 72.)

The allegations made against Carbone do not establish that an actual conflict of interest
existed. Cardoza has the burden of showing that there was a divergence between Carbone's
interests and his own, which he has failed to demonstrate. *See Schwarz*, 283 F.3d at 91. First,
Cardoza argues that Carbone had a personal interest in preventing his own criminal conduct
within the Organization from being revealed (Pet'r's Mem. at 85), but Carbone's conduct does
not demonstrate a course of action that was "inherently in conflict" with Cardoza. *See Schwarz*,
283 F.3d at 92. Cardoza's assertions are undermined by the fact that prior to trial, Carbone
negotiated with the prosecutor for a plea and cooperation agreement which required Cardoza to
provide information about the Organization's drug enterprise in exchange for a reduced
sentence—a reduced sentence that was contingent on how much information Cardoza supplied to
the government. Assuming Cardoza's assertion that Carbone was protecting his own interests
was true, it would logically follow that Carbone, acting in his own self-interest, would not
arrange a Plea and Cooperation Agreement where his own criminal involvement with the

24

Organization was at risk of being revealed. Cadoza's allegations therefore do not support the contention that Carbone and Cardoza's interests diverged or that Carbone failed to pursue a course of action because it "was inherently in conflict with [] the attorney's other loyalties or interests." *Schwarz*, 283 F.3d at 92.

Although Carbone's failure to advise Cardoza about the § 220.10(2) plea constitutes ineffective assistance of counsel, there is no evidence that this failure was the result of a conflict of interest. Cardoza claims that Carbone's lapse in representation occurred when Carbone permitted Cardoza to participate in proffer sessions and when Carbone negotiated an "unacceptable full-cooperation plea deal" (Pet'r's Mem. at 80), but Cardoza has not demonstrated how Carbone's mishandling of the plea negotiation process was a result of Carbone's "other loyalties or interest." *Williams*, 372 F.3d at 106.

With respect to Cardoza's second claim that Carbone's simultaneous representation of Perez and Sanchez created a conflict of interest, that argument also fails. In the context of multiple representations, an attorney's own interests diverge from those of the client when "the attorney's loyalty to the client is compromised." *Fulton*, 5 F.3d at 609. In these situations, the personal interests of the attorney and the interests of the client are in actual conflict. *Id.*

In *Schwarz*, the defendant, a police officer, claimed ineffective assistance of counsel based on a conflict of interest. *Schwarz*, 283 F.3d at 80. While Schwarz was being represented in a criminal case, his attorney entered into a $10 million retainer agreement with the Policeman's Benevolent Association ("PBA"). The PBA was fighting a civil suit that arose from Schwarz's criminal case. Even though the attorney was prohibited from formally representing the PBA in the civil case, the court held that the he still had "an unalloyed duty to the PBA" which diverged from Schwarz's interest in putting on a viable defense. *Id.* at 91. The court concluded that the

25

retainer was a more compelling client for the attorney to represent and therefore, he was obligated to refrain from engaging in any conduct to which the PBA might object, including defending a client in a case which would negatively impact the PBA. *Id.* at 91-92.

Cardoza argues that if he had an attorney who only had his interest in mind, that attorney would never have encouraged him to enter into the "disastrous course of action," of agreeing to cooperate with the prosecution in exchange for his wife's release. (*See* Pet'r's Mem. at 81.) However, Cardoza presents no evidence that Carbone "encouraged" him to cooperate. Furthermore, Cardoza testified that he "agreed to participate in proffer sessions in exchange for getting [his] then-wife and codefendant, Consuelo Perez, released on bail." (Cardoza's Aff. ¶ 10.) Unlike *Schwarz*, where the attorney neglected to pursue a viable defense for one client because it would potentially harm another client's case, here Cardoza willingly made the decision to talk to the Government in exchange for his wife's release. (Pet'r's Mem. at 81.) The action pursued furthered a different interest of *Cardoza's*, not an interest of his attorney's.

Furthermore, Cardoza has failed to allege facts that support the contention that the simultaneous representation of Sanchez in the federal case created a conflict of interest. The trial court held that Cardoza failed to "demonstrate a divergence of interest between himself and counsel that caused a 'divided loyalty' on counselors part, and 'operated on' the representation." *People v. Cardoza*, 803 N.Y.S.2d 65 (N.Y. App. Div. 2005); (*see also* Dannelly Decl., Ex. E). Moreover, there are no facts that establish Carbone refrained from conduct or strategic choices that advanced Sanchez's interest over the interests of Cardoza. If anything, the facts only bolster a finding that Carbone and Cardoza's interests were aligned. I find that Cardoza has failed to establish how the simultaneous representation of Sanchez and Perez compromised Carbone's simultaneous representation of Cardoza.

26

In sum, Carbone did not represent Cardoza at trial and only represented him for two months during pretrial proceedings. During this short period of time Carbone did not pursue any course of action, nor did he engage in conduct that was at odds with Cardoza's interest. Furthermore, the allegations Cardoza makes linking Carbone to the Organization's criminal conduct only support a finding that Carbone and Cardoza shared an interest in preventing any evidence of the Organization's criminal acts from surfacing. Thus, Cardoza has failed to establish that there was a conflict of interest present in Carbone's representation of him.

## IV. CONCLUSION

For the foregoing reasons, I recommend that Cardoza's Petition be **GRANTED in part, and DENIED in part,** and that Cardoza's case be remanded to New York state court, which should be directed to restore Cardoza to the pretrial plea decision stage of the proceedings and permit him to plead guilty to the entire indictment, in exchange for a minimum sentence of no more than twenty-five years.

Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Paul A. Crotty, 500 Pearl Street, Room 735, and to the chambers of the undersigned, Room 1970. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1) (West Supp. 1995); Fed. R. Civ. P.'s 72, 6(a), 6(d).

27

DATED: December 30, 2010
New York, New York

Respectfully Submitted,

_____
The Honorable Ronald L. Ellis
United States Magistrate Judge

Copies of this Report and Recommendation were sent to:
Counsel for Petitioner:
Svetlana M. Kornfeind
The Legal Aid Society
199 Water Street
New York, NY 10038

Counsel for Defendant:
Ashlyn Dannelly
New York State Attorney General's Office
120 Broadway, 22nd Floor
New York, NY 10271